Terrence R. JABLONSKY, Employee Transfer Corporation, C.O. Parsons and Doris Parsons, Reubin E. Bitz and Viola G. Bitz, Bertha Anton, Robert J. Jablonsky and Margaret M. Jablonsky, First Federal Savings and Loan Association of Bismarck, Rose Frenzel and Randy J. Frenzel, Edwin A. Ficek and Mary Ann Ficek, Richard Privratsky and Bernadette Privratsky, Thomas F. Ehli and Tess R. Ehli, Mike Cozad and Susan Cozad, Wilbur W. Bohrer and Audrey M. Bohrer, Jeffrey J. Conlon, Joseph G. Lupo and Virginia Lupo, Curtis P. Martin, Marvin M. Morel, Ida G. Butler, Randall J. Decker and Linda R. Decker, Plaintiffs, Appellees and Cross-Appellants,

v.

Robert A. KLEMM and Design Innovation and Development, Inc., a corporation, Defendants, Appellants and Cross-Appellees.

Civ. No. 10921.

Supreme Court of North Dakota.

Nov. 21, 1985.

Howe, Hardy, Galloway & Maus, Dickinson, for plaintiffs, appellees and cross-appellants; argued by Gary A. Ficek.

Mackoff, Kellogg, Kirby & Kloster, Dickinson, for defendants, appellants and cross-appellees; argued by James D. Geyer.

ERICKSTAD, Chief Justice.

Defendants Robert A. Klemm and Design Innovation and Development, Inc. [DID], appeal from a district court judgment awarding 21 of 28 members of the Hillside Village Condominium Association a total of $96,865.90, plus interest. Those 21 members, along with seven members of the condominium association who had their claims dismissed with prejudice [plaintiffs], have cross-appealed from the judgment.

The plaintiffs are owners of condominium units in the Hillside Village Condominium in Dickinson. After a wooden retaining wall located behind the units failed, the plaintiffs brought this action against DID, the corporate developer of the condominium project, and Klemm, an officer and stockholder of DID, based on theories of negligence and breach of warranty. Following a bench trial, the district court ruled that DID, through its agents, negligently designed and constructed the retaining wall and that such conduct was the proximate cause of the wall's failure. The court also found that DID was liable under the implied warranty theory.

The district court concluded that the measure of damages was the cost of repairing the wall in a suitable fashion, and found that the cost of reconstructing in concrete the wooden portion of the wall would be $135,000. The court found, how-

ever, that seven of the plaintiffs were "100 percent negligent" in purchasing their units with knowledge of the defective retaining wall and were therefore not entitled to relief. The court awarded the remaining plaintiffs approximately $97,000 and found that, under the circumstances, it was proper to pierce the corporate veil of DID and hold Klemm personally liable for the damages.

On appeal Klemm and DID do not challenge the trial court's findings of negligence and breach of implied warranty, but assert that the trial court erred in piercing the corporate veil and that it applied an inappropriate measure of damages. The plaintiffs assert in their cross-appeal that the district court erred in failing to find Klemm directly liable under their theories of recovery; that the court erred during pretrial proceedings in ordering that the case be dismissed unless the individual condominium owners were substituted as plaintiffs in place of the condominium association; and that the court erred in apportioning the damages between the unit owners.

### FACTS

The condominium project was conceived by Klemm and Ed Anheluk in 1976, and DID was incorporated to be the developer. Klemm served as president and general manager of DID while his wife and father were listed as the other officers of the corporation. Klemm was authorized a $1,500 per month salary as general manager, but he did not collect his salary. The initial capitalization of the corporation was $19,000, and Klemm and his wife were the sole shareholders.

Klemm and Anheluk orally agreed that Anheluk would design and supervise construction of the project and that the profits would be divided between DID and Anheluk. Klemm obtained the necessary financing for the project and Anheluk collected $100 per week from DID as an advance on anticipated profits.

The project was built in three phases. DID borrowed $250,000 for phase one, $300,000 for phase two, and $500,000 for phase three. The construction work was done by employees of Klemm Design Innovations [KDI], a sole proprietorship owned and operated by Klemm, which also furnished the carpet and kitchen cabinets for the project. KDI earned a 13 percent profit on $78,000 in kitchen cabinets it furnished DID. There was $209,000 in total business volume between KDI and DID, but DID failed to pay KDI $22,000 of that amount. The construction workers were paid by KDI, which billed DID and received reimbursement from the lender. DID rented a one-room office in the KDI building for $250 per month, but those payments were not made to KDI. DID had no employees and owned no equipment. Construction equipment was obtained from KDI through an oral lease agreement.

Before disbursing the funds for the second and third phases of the project, the lender required that some of the units be sold. Klemm personally purchased two unfinished units for 20 percent less than their value. After the units were completed, Klemm sold the units and received a $27,000 profit which he personally retained.

The project took six years to complete and involved approximately $1,340,000 in sales. At the end of 1983, DID had a net deficit of $31,600. One of the last structures built was the wooden retaining wall which is the subject of this lawsuit.

The land on which the project was constructed is located on the side of a hill. The hill was leveled for construction purposes, leaving a high dirt and rock wall 20 to 25 feet behind the buildings. Anheluk designed the retaining wall and he and two KDI employees built it. Klemm gave final approval to the design. The lower portions of the wall were constructed with stone and the higher portions with wood. The wooden portion of the wall, which is 355 feet in length, varies in height from seven feet to 13 feet, in violation of Dickinson building code provisions prohibiting a wooden retaining wall more than six feet in height. Anheluk and Klemm admitted that the wall was built mainly for appearance

and that no thought was given to lateral earth pressures or the strength of the building materials. Expert testimony established that the retaining wall was underdesigned and overstressed between 4 to 12 times more than its holding capacity. On June 10, 1982, a portion of the wall collapsed, threatening the common areas, decks and patios, and the interior space of some of the units.

## PIERCING THE CORPORATE VEIL

In reaching its decision to pierce the corporate veil, the trial court analyzed this case under factors set forth in *Hilzendager v. Skwarok*, 335 N.W.2d 768 (N.D.1983). The trial court found that although the minimum corporate formalities were observed, DID was insufficiently capitalized; DID became technically insolvent within a year of its incorporation; there was "some siphoning of funds" by Klemm; the other officers and directors of DID were nonfunctioning; and "the existence of DID was merely a facade for Klemm's individual dealings." The court also determined that "[t]he notion of D.I.D. as a legal entity is only being used to justify a wrong committed against the buyers of these condo units."

Klemm has launched a multifarious attack on the trial court's decision to pierce the corporate veil. His assertions generally relate to the elements necessary under North Dakota law for piercing the corporate veil, the adequacy of the plaintiffs' complaint with regard to these elements, and the evidentiary support for the trial court's findings.

In *Hilzendager, supra*, 335 N.W.2d at 774, we stated:

"It is the general rule that officers and directors of a corporation are not generally liable for the ordinary debts of the corporation. *Danks v. Holland*, 246 N.W.2d 86, 90 (N.D.1976). However, in *Schriock v. Schriock*, 128 N.W.2d 852, 866 (N.D.1964), our court stated:

"'"... but, when the notion of legal entity is used to defeat public convenience, justify wrong, protect fraud, or

defend crime, the law will regard the corporation as an association of persons." Fletcher, Private Corporations Sec. 41 (1963 rev.vol.).'

"*See also Danks v. Holland, supra; Family Center Drug v. North Dakota St. Bd. of Pharm.*, 181 N.W.2d 738, 745 (N.D.1970).

"It has also been held that factors considered significant in determining whether or not to disregard the corporate entity include: insufficient capitalization for the purposes of the corporate undertaking, failure to observe corporate formalities, nonpayment of dividends, insolvency of the debtor corporation at the time of the transaction in question, siphoning of funds by the dominant shareholder, nonfunctioning of other officers and directors, absence of corporate records, and the existence of the corporation as merely a facade for individual dealings. *Victoria Elevator Co. v. Meriden Grain Co.*, 283 N.W.2d 509, 512 (Minn.1979)."

Klemm first asserts that proof of fraud is a prerequisite for piercing the corporate veil. Although fraud has been present in some of this court's decisions on piercing the corporate veil [*see Hilzendager, supra; Schriock, supra*], other cases indicate that fraud did not exist under the facts presented. *See Larson v. Unlimited Business Exch. of N.D.*, 330 N.W.2d 518, 521 (N.D.1983); *Family Center Drug, supra; Mahanna v. Westland Oil Company*, 107 N.W.2d 353, 361–362 (N.D.1960). We disagree with Klemm's assertion and follow the generally accepted rule that proof of fraud is not a necessary prerequisite for disregarding the corporate entity. *E.g.*, 1 Fletcher, Cyclopedia of the Law of Private Corporations § 41.30, at p. 19 (1984 Supp.); *Anderson v. Abbott*, 321 U.S. 349, 362, 64 S.Ct. 531, 538, 88 L.Ed. 793, 803 (1944); *DeWitt Truck Brokers v. W. Ray Flemming Fruit Co.*, 540 F.2d 681, 684 (4th Cir.1976); *Team Cent., Inc. v. Teamco, Inc.*, 271 N.W.2d 914, 923 (Iowa 1978); *White v. Jorgenson*, 322 N.W.2d 607, 608

(Minn.1982); *Amfac Mechanical Supply Co. v. Federer,* 645 P.2d 73, 79 (Wyo.1982).

Klemm next asserts that even if fraud is not required, there must exist an element of injustice or fundamental unfairness before the corporate veil may be pierced. The plaintiffs contend that injustice or fundamental unfairness is not a requisite element because this court in *Hilzendager, supra,* in adopting the eight factors set forth by the Minnesota Supreme Court in *Victoria Elevator Co., supra,* did not specifically adopt the second prong of the piercing test, that "[d]isregard of the corporate entity requires not only that a number of these factors be present, but also that there be an element of injustice or fundamental unfairness." Alternatively, the plaintiffs contend that even if injustice or fundamental unfairness is required, the trial court so found and that the record supports that determination.

■ On several occasions, this court has mentioned some type of inequitable conduct or an inequitable result as a relevant factor in determining whether to pierce the corporate veil. *E.g., Federal Sav. and Loan Ins. Corp. v. Morque,* 372 N.W.2d 872, 876 (N.D.1985) [corporate entity "may be disregarded to avoid injustice."]; *Danks v. Holland, supra,* [no showing of "flagrant wrongdoing" sufficient to pierce corporate veil]; *Fire Ass'n of Philadelphia v. Vantine Paint & Glass Co.,* 133 N.W.2d 426, 432 (N.D.1965) [nothing "unfair or fraudulent" in the conduct of corporations or individuals, nor was it shown that corporations were "used as a cover for the others for any ulterior purpose."] Our adoption of the *Victoria Elevator Co.* factors in *Hilzendager,* without specific mention of the element of injustice or unfairness, was not intended to delete that element, which has long been recognized by this court and others as the fundamental basis for disregarding the corporate entity. *See, e.g., Schriock, supra.* We believe that an element of injustice, inequity or fundamental unfairness must be present before a court may properly pierce the corporate veil.

While we have concluded that an element of unfairness must exist in addition to a number of the factors adopted in *Hilzendager,* we do not imply that the facts upon which the unfairness is found to exist must be mutually exclusive of the facts supporting findings on the *Hilzendager* factors. The factors enunciated in *Hilzendager* were adopted from the Minnesota Supreme Court's decision in *Victoria Elevator Co.,* which in turn adopted those factors from the Fourth Circuit Court of Appeal's decision in *DeWitt Truck Brokers, supra,* 540 F.2d at 685–686. The Fourth Circuit Court of Appeals indicated that the element of unfairness may be established under appropriate circumstances by the showing of a number of these factors, which, "all fitting into a picture of basic unfairness, has been regarded fairly uniformly to constitute a basis for an imposition of individual liability under the doctrine." *DeWitt Truck Brokers, supra,* 540 F.2d at 687 (footnote omitted). *See also Labadie Coal Co. v. Black,* 672 F.2d 92, 99 (D.C.Cir.1982) [failure to adequately capitalize the corporation for the reasonable risks of the corporate undertaking may provide the required "injustice"]; *Eagle Air v. Corroon & Black/Dawson & Co.,* 648 P.2d 1000, 1004–1005 (Alaska 1982) [draining of corporate assets sufficient to satisfy element of "wrongdoing."]

Before determining whether the facts in the instant case are sufficient for disregarding the corporate entity, we first address Klemm's contention that the plaintiffs' claim for piercing the corporate veil should be dismissed because it was inadequately pleaded.

The plaintiffs' second amended complaint alleges in part:

"That the individual Defendant, Robert A. Klemm, is the alter ego of the corporation in that at all times set forth herein:

"1. He was the primary individual who organized the corporation;

"2. He was the President and principal officer of the corporation;

"3. He was the controlling shareholder of the corporation;

"4. He was the person who had the controlling responsibility of the corporation organization and its operations;

"5. He was the person who derived the benefits of the corporate organization and activities."

The complaint also states that the plaintiffs sought to impose liability "against the Defendant Robert A. Klemm or Defendant Design Innovation, Inc., or both Defendants Robert A. Klemm and Design Innovation, Inc., ..."

██ Klemm asserts that the plaintiffs have failed to plead fraud or injustice with the requisite particularity under Rule 9(b), N.D.R.Civ.P. However, actual fraud is not an essential element for imposing the doctrine, and the plaintiffs did not attempt to rely on actual fraud as a ground for piercing the corporate veil. *See generally Schattner v. Girard, Inc.,* 668 F.2d 1366, 1370 (D.C.Cir.1981). We are not persuaded that concepts such as unfairness or injustice fall within the ambit of Rule 9(b), N.D.R.Civ.P.

Klemm also contends that the plaintiffs' failure to specifically plead insolvency and undercapitalization requires that the trial court's findings with regard to those factors should be excluded from consideration. We disagree.

██ Complaints are construed liberally so as to do substantial justice. *Reule v. Bismarck Public School District,* 376 N.W.2d 32 (N.D.1985). Rule 8(a), N.D.R.Civ.P., provides that a pleading shall contain a short and plain statement of the claim showing that the pleader is entitled to relief, and a demand for judgment for the relief to which he deems himself entitled. The purpose of the rule is to "place the defendant on notice as to the nature of the plaintiff's claim," and "[p]leadings that indicate generally the type of claim that is

involved, satisfy the spirit of Rule 8(a), ..." *Gowin v. Hazen Memorial Hospital Ass'n,* 311 N.W.2d 554, 556 (N.D.1981). Under our liberal pleading rules, the plaintiffs were not required to allege every element of their claim, and we conclude that the allegations in the complaint sufficiently apprised Klemm that the plaintiffs were seeking to pierce the corporate veil and hold him personally liable. *See, e.g., Lyons v. Stevenson,* 65 Cal.App.3d 595, 135 Cal. Rptr. 457, 464–465 (1977); *Adam v. Mt. Pleasant Bank & Trust Co.,* 355 N.W.2d 868, 870–871 (Iowa 1984); *Druding v. Allen,* 122 N.H. 823, 451 A.2d 390, 393 (1982).

Our next inquiry is whether or not the evidence is sufficient to support the trial court's decision to disregard the corporate entity of DID and hold Klemm personally liable.

██ The burden of establishing a basis for piercing the corporate veil rests on the party asserting the claim. *E.g., DeWitt Truck Brokers, supra,* 540 F.2d at 683. Resolution of the issue is "heavily factspecific and, as such, is peculiarly within the province of the trial court." *United States v. Jon-T Chemicals, Inc.,* 768 F.2d 686, 694 (5th Cir.1985). *See also Mobridge Community Industries v. Toure,* 273 N.W.2d 128, 132 (S.D.1978). Consequently, we will not disturb the trial court's resolution of the issue on appeal unless it is clearly erroneous. Rule 52(a), N.D.R.Civ.P. *E.g., Jon-T Chemicals, Inc., supra; DeWitt Truck Brokers, supra,* 540 F.2d at 684. We note also that the attitude toward judicial piercing of the corporate veil is more flexible in tort, as opposed to ordinary contract actions. *See generally Jon-T Chemicals, Inc., supra,* 768 F.2d at 692–693; *Edwards Co., Inc. v. Monogram Industries, Inc.,* 730 F.2d 977, 980–984 (5th Cir.1984); 1 Fletcher, Cyclopedia of the Law of Private Corporations § 41.85, at p. 25 (1984 Supp.) [1]

---

1. The differential treatment accorded tort and contract cases is usually attributed in major part to the element of choice inherent in a contractual relationship. *See Miles v. American Tel. & Tel. Co.,* 703 F.2d 193, 195 (5th Cir.1983). In an ordinary contract action, the creditor has voluntarily contracted with, and advanced credit to, the debtor corporation of its choice with regard to a readily discernable financial obligation. In an ordinary tort case, the debtor-creditor rela-

In the present case, the district court based its ultimate finding that it was proper to pierce the corporate veil on a number of findings based on the factors set forth in *Hilzendager.* Klemm asserts that the trial court's findings that DID was insufficiently capitalized and insolvent are clearly erroneous. The court in *DeWitt Truck Brokers, supra,* 540 F.2d at 686, stated that " '[t]he obligation to provide adequate [risk] capital begins with incorporation and is a continuing obligation thereafter * * * during the corporation's operations.' " [quoting Gillespie, *The Thin Corporate Line: Loss of Limited Liability Protection,* 45 N.D.L.Rev. 363, 387–388 (1968) ]. In *Briggs Transp. Co. v. Starr Sales Co.,* 262 N.W.2d 805, 810 (Iowa 1978), the court stated:

> " 'If a corporation is organized and carries on business without substantial capital in such a way that the corporation is likely to have no sufficient assets available to meet its debts, it is inequitable that shareholders should set up such a flimsy organization to escape personal liability. The attempt to do corporate business without providing any sufficient basis of financial responsibility to creditors is an abuse of the separate entity and will be ineffectual to exempt the shareholders from corporate debts. It is coming to be recognized as the policy of the law that shareholders should in good faith put at the risk of the business unencumbered capital reasonably adequate for its prospective liabilities. If capital is illusory or trifling compared with the business to be done and the risks of loss, this is a ground for denying the separate entity privilege.' "

tionship is forced upon the creditor by the occurrence of the unexpected tort itself. *Cf. Jon-T Chemicals, Inc., supra;* 1 Fletcher, *supra.* Thus, of particular significance in most tort cases is whether the corporation is undercapitalized, and the question involves an added public policy consideration, *i.e.,* whether an individual should be able to transfer a risk of loss or injury to members of the public in the name of a corporation that is marginally financed. *See generally Nelson v. International Paint Co., Inc.,* 734 F.2d 1084, 1092 (5th Cir.1984); Gillespie,

[quoting Ballantine, Corporations § 129, at pp. 302–303 (rev.ed. 1946) ].

■ The trial court found that DID's initial capitalization in 1976 was $19,000 and that no other capital was infused into the corporation during its seven-year existence. DID's accountant testified that the operating expenses during those seven years averaged $14,000 per year, and that the initial $19,000 provided "about a year and a half of expense or working capital needs." The trial court found that the project, built entirely with borrowed money, took six years to complete, involved approximately $1,340,000 in sales, and for the vast majority of its existence, the corporation was insolvent and "had no assets other than one box of envelopes and 2,000 purchase orders." The court found that the inadequate capitalization led to the corporation's insolvency and that "[f]rom 1976 through 1983, liabilities exceeded assets almost 100 percent of the time." Klemm admitted that DID owed him a salary and that the unpaid salary constituted a debt that DID could not pay. DID was also unable to pay rent and other debts to KDI, Klemm's sole proprietorship. DID reported a loss each year of its existence. The trial court found that at the time the retaining wall, which was one of the last items of construction, was built, DID had no capital, was insolvent, and as a result, "the Plaintiffs got a cheap and grossly inadequate wall." The court characterized the capital as "trifling compared with the business to be done and the risks of loss." We conclude that the trial court's findings on the factors of insufficient capitalization and insolvency are not clearly erroneous.

*The Thin Corporate Line: Loss of Limited Liability Protection,* 45 N.D.L.Rev. 363, 389–394 (1968).

The instant case sounds in both tort and contract, *i.e.,* negligence and breach of implied warranty. It has been noted, however, that "[t]he seller's warranty is a curious hybrid, born of the illicit intercourse of tort and contract, unique in the law," which "never has lost entirely its original tort character." Prosser, Handbook of the Law of Torts § 95, at pp. 634, 635 (4th ed. 1971) (footnotes omitted).

The trial court's finding that Klemm "siphoned" funds from DID is also supported by the record. Klemm purchased two incomplete units for less than fair value, had them completed, and subsequently sold them and retained a profit of $27,000. The record also establishes that KDI, Klemm's sole proprietorship, furnished carpet and kitchen cabinets for the project and made a 13 percent profit on the $78,000 in cabinets furnished to DID. The court noted that although the amount of siphoning was not large in relation to the total sales of the company, the amount was large in relation to the capital. Furthermore, we believe that, under the circumstances here the fact Klemm "siphoned" any funds at all is more significant than the amount.

Klemm also asserts that the trial court's finding that DID existed as merely a facade for individual dealings is clearly erroneous. The record reflects that the preliminary design plan for the project was submitted to the city with the KDI stamp on it. DID employees were actually KDI employees who were paid by KDI, which billed DID. KDI and DID conducted more than $200,000 in business volume between themselves. DID had no employees or equipment, but leased its equipment from KDI. DID's only office was in the KDI building, and when DID and KDI entered into agreements with each other, it was in actuality, Klemm, president of DID, dealing with Klemm, sole proprietor of KDI. The trial court noted that DID was nothing more than a "pass-through" corporation, which constructed and sold $1,340,000 in property without employees, a payroll or equipment, and that the money and property involved in the venture always made its way to KDI and Klemm. We conclude that the trial court's findings on the facade factor are not clearly erroneous.

We also conclude that the trial court's finding that "[t]he notion of D.I.D. as a legal entity is only being used to justify a wrong committed against the buyers of

these condo units" is not clearly erroneous and satisfies the unfairness element of the piercing test. As the court stated in *Labadie Coal Co., supra,* 672 F.2d at 100:

"The 'errant' party need not have willfully wronged the other party, nor need he have engaged in anything amounting to fraud in their relationship. The essence of the fairness test is simply that an individual businessman cannot hide from the normal consequences of *carefree* entrepreneuring by doing so through a corporate shell." [Emphasis in original.]

A finding of fact is clearly erroneous when, although there is some evidence to support it, the reviewing court is left with a definite and firm conviction that a mistake has been made; the mere fact the appellate court might have viewed the facts differently if it had been the initial trier of the case does not entitle it to reverse the lower court. *E.g., Industrial Fiberglass v. Jandt,* 361 N.W.2d 595, 598 (N.D.1985). Under the circumstances of this case, we cannot say that the trial court's decision to pierce the corporate veil of DID and hold Klemm personally liable to the plaintiffs is clearly erroneous.[2]

## DAMAGES

The trial court found that the measure of damages was the "cost of repairing the wall in a suitable fashion." Klemm contends that the trial court applied the incorrect measure of damages under both the breach of warranty claim and the negligence claim.

There are two possible measures of damages for breach of warranty:

"If the contract is substantially performed, and the breach of contract can be remedied without taking down and reconstructing a substantial portion of the building, the amount of damages is the cost of making the work conform to the contract. Or, where the defects cannot be remedied without reconstruction of a substantial portion of the work, the

---

**2.** Because of our disposition of this issue, it is unnecessary to address the plaintiffs' assertion in the cross-appeal that the trial court erred in

failing to find Klemm directly liable under their theories of recovery.

measure of damage is the difference in value between what it would have been if built according to contract and what was actually built." *Dobler v. Malloy*, 214 N.W.2d 510, 518 (N.D.1973).

We have also stated that the thrust of § 32–03–09.1, N.D.C.C., which sets forth the measure of damages for injury to property not arising from contract, is that "either the cost to repair or the diminution in value, whichever is lower, is the measure which should be applied." *Roll v. Keller*, 356 N.W.2d 154, 157 (N.D.1984).

■ In the present case, an expert appraiser testified that the condominium units were depreciated in value equal to the cost of repairing the retaining wall. Thus, the trial court did not err in holding that the proper measure of damages under the facts of this case was the cost to repair the wall in a suitable fashion.

■ Klemm also asserts that the trial court erred in ruling that the amount of damages required to repair the retaining wall was $135,000, rather than $25,000. The structural engineer called by the plaintiffs testified that, given the height and width, a concrete crib or cantilevered concrete wall was necessary to correct the problem. He estimated the cost to be between $135,000 and $165,000. An engineer called by the defendants testified that the wooden wall could be repaired for $25,000 by stabilizing it with steel pipe posts anchored by cable 12 feet long running onto neighboring property. The trial court reasoned that because the defendants' witness did not include in his estimate any cost of securing easements from the adjoining landowners, which would be necessary for the anchors under his proposal, the plaintiffs' evidence was of the greater weight.

A trial court's determination of the amount of damages will not be set aside on appeal unless it is clearly erroneous. *E.g.*, *Meyer v. Hansen*, 373 N.W.2d 392, 398 (N.D.1985). The trial court's finding on the amount of damages in this case is supported by the record and is not clearly erroneous.

## REAL PARTY IN INTEREST

■ The plaintiffs assert that the trial court erred in concluding that the individual owners of the condominium units, rather than the condominium association, were the real parties in interest. The trial court ordered that the action be dismissed unless the individual owners were substituted as plaintiffs. It is unnecessary for us to decide whether the condominium association, as an unincorporated association, has the capacity in general to bring suit, *see Askew v. Joachim Memorial Home*, 234 N.W.2d 226 (N.D.1975), because even if it does, we agree with the trial court that under the facts of this case the association was not the real party in interest.

Rule 17(a), N.D.R.Civ.P., provides that "[e]very action shall be prosecuted in the name of the real party in interest." A real party in interest is " 'one who has a real, actual, material, or substantial interest in the subject matter of the action.' " *Associated General Contractors v. Local No. 580*, 278 N.W.2d 393, 397 (N.D.1979) [quoting *E.E. Bach Millwork Co. v. Meisner & Co.*, 228 N.W.2d 904, 906 (N.D.1975) ].

The plaintiffs contend that the association is the real party in interest because the condominium declaration provides that "[t]he maintenance and operation of common areas shall be the responsibility and expense of the Association." The plaintiffs also rely on a section of the "By-Laws of the Hillside Village Condominium" stating that the board of managers "shall enforce by legal means the provisions of the Condominium Act, the applicable Declarations of Condominium, the By-Laws and the regulations for the use of the property in the condominium." Klemm asserts that because our condominium laws, Chapter 47–04.1, N.D.C.C., do not authorize a condominium association to bring suit on behalf of individual unit owners, and because the individual owners, rather than the association, hold title to the common elements, the individual owners are the real parties in interest.

In jurisdictions which statutorily authorize a condominium association to bring suit in a representative capacity on behalf of individual unit owners, courts have generally held that an association has standing and is the real party in interest in suits for damage to common elements, regardless of whether the association actually owns the common elements. *E.g., Starfish Condo v. Yorkridge Service Corp.*, 295 Md. 693, 458 A.2d 805 (1983); *Siller v. Hartz Mountain Assoc.*, 93 N.J. 370, 461 A.2d 568 (1983); *Stony Ridge Hill, Etc. v. Auerbach*, 64 Ohio App.2d 40, 410 N.E.2d 782 (1979); *Towerhill Condo. Assoc. v. American Condo.*, 66 Or.App. 342, 675 P.2d 1051 (1984); *Brickyard Homeowners' Ass'n v. Gibbons Realty*, 668 P.2d 535 (Utah 1983). However, in jurisdictions which do not statutorily authorize a condominium association to bring suit on behalf of unit owners, and where the association holds no title to the common areas, courts have generally ruled that the association lacks standing and is not the real party in interest in suits relating to the common elements. *See Friendly Village Com. Ass'n, Inc. v. Silva & Hill Const. Co.*, 31 Cal.App.3d 220, 107 Cal.Rptr. 123 (1973); *Summerhouse, Etc. v. Majestic Savings & Loan*, 44 Colo.App. 495, 615 P.2d 71 (1980); *Hendler v. Rogers House Condominium, Inc.*, 234 So.2d 128 (Fla.Dist.App.1970);[3] *Spring Mill Townhomes v. OSLA Fin. Ser.*, 124 Ill.App.3d 774, 80 Ill.Dec. 378, 465 N.E.2d 490 (1983); *Deal v. 999 Lakeshore Ass'n*, 94 Nev. 301, 579 P.2d 775 (1978); Annot., 72 A.L.R.3d 314 (1976); Annot., 69 A.L.R.3d 1148 (1976); *but see 1000 Grandview Ass'n v. Mt. Washington Assoc.*, 290 Pa.Super. 365, 434 A.2d 796 (1981); *Queen's Grant Villas Horizontal Property Regimes I–V v. Daniel International Corporation*, — S.C. —, 335 S.E.2d 365 (1985).

In the present case, the condominium association does not own the common elements involved in this lawsuit,[4] nor does Chapter 47–04.1, N.D.C.C., specifically authorize a condominium association to bring suit on behalf of unit owners with regard to damages to the common elements. We hold that the trial court did not err in concluding that the individual unit owners, rather than the condominium association, were the real parties in interest.

 The plaintiffs also assert that the trial court erred in apportioning the damages between the individual unit owners and denying recovery to those who purchased their units with notice of the defective retaining wall. They contend that, as tenants in common to the common property areas of the project, each of the owners would have had a right to maintain an action for the entire amount of the damages caused by DID's tortious acts, and thus the fact some unit owners were found to be negligent in purchasing with notice of the defective retaining wall should not require reduction in the total amount of recovery.

It has been observed that:

"When a single cotenant suing alone brings ejectment, or other action to recover possession of land, against an outside wrongdoer, he is, in most jurisdictions, able to secure a result applicable to the whole of the common asset, and the recovery so made inures to the benefit of the other cotenants.... When, however, the purpose of the action is to recover damages for injuries inflicted by a wrongdoing outsider on the common asset, all tenants in common must be joined except, in the unusual case, where there has been some severance of the claim. This requirement may be waived by the wrongdoing defendant's failure to raise the question as to needed parties, and, in such a situation, the plaintiffs suing recover the proportion of the total damages represented by the fraction of total ownership had by these plaintiffs. It is, of course, permissible for a single cotenant

---

3. This decision has been superseded by a subsequent legislative enactment. *See Imperial Towers Condominium, Inc. v. Brown*, 338 So.2d 1081 (Fla.Dist.Ct.App.1976).

4. Section 47–04.1–06(2), N.D.C.C., provides that "[t]he common areas are owned by the owners of the units as tenants in common in proportion to each unit's interest."

to sue for his fraction of the damages inflicted on his fraction of ownership in a case *where the other cotenants have consented to the wrongful action by the outsider, thereby barring themselves from sharing in any recovery."*

4A Powell, The Law of Real Property § 606, at pp. 625–627 (1982) (footnotes omitted, emphasis added). *See also* 4 Thompson, Commentaries on the Modern Law of Real Property § 1816 (1979); *Hicks v. Southwestern Settlement & Develop. Corp.,* 188 S.W.2d 915, 921 (Tex.Civ.App. 1945) ["the rights of the various tenants in common to recover damages for injury to the property owned in common are technically several as distinguished from joint," and "each tenant in common is only entitled to the possession of his own share of the damages; ...".].

In the present case, the trial court found that on January 1, 1982, the retaining wall was in such condition that a buyer knew or should have known of the defects in the wall, and that thereafter, "buyers were 100 percent negligent in buying and assumed all risk." The plaintiffs have not challenged that finding on appeal. We conclude that under the circumstances here, the trial court did not err in apportioning the damages and denying recovery to those plaintiffs who purchased their units with notice of the defective retaining wall.

For the reasons stated in this opinion, the judgment is affirmed.

VANDE WALLE, LEVINE, MESCHKE and GIERKE, JJ., concur.

MESCHKE, Justice, concurring specially.

I concur in the careful and thorough analysis of the Chief Justice. I write separately only to emphasize the closely balanced nature of the evidence on the underlying factual issues in disregarding the corporate form in this case.

The initial capital was no doubt inadequate for the scope of the project undertaken. Where profits from the corporate venture are insufficient to further fuel the capital needs of the venture, it is difficult to view an initial capitalization this meagre in relation to the size of the project as anything but insufficient where substantial liabilities are left. However, the finder of fact might also have viewed the largely uncompensated services of Klemm, the principal officer and stockholder, as additional contribution to capital, rather than as simply another liability contributing to the insolvency of the corporation.

As to insolvency, the record indicates that, besides these claims, the remaining indebtedness of this corporation was substantially all owed to Klemm alone. In my view, debts to the sole stockholder should not count in piercing the corporate veil. It is the claims pursued in this action alone which sustain the finding of insolvency here. In another case, a single claim or class of claims would not necessarily, as a matter of fact, sustain a finding of insolvency when the insolvency arises near the end of corporate activity over a period of years.

It is only in the context of clearly inadequate capitalization that the accompanying findings of "siphoning" and "facade" can be considered sufficient. In another case, the finder of fact might well conclude that a fair profit on several transactions with the corporation would not lead to the inference of diversion of corporate funds by a sole stockholder, particularly where, as here, he drew no salary as an officer and rent owed to him went unpaid. The Chief Justice notes that the fact that Klemm "siphoned" any funds at all is more significant than the amount involved. That may well be true in some instances, but here the finding of "siphoning" seems sustainable only because the amounts exceed initial capital contributed.

Our sustaining the factual finding of "facade" in this case should not be understood as a rule that a sole stockholder cannot do business with his own corporation. That is not the law, nor should it be. Where services are furnished at cost, without gouging, and also are carefully documented, as they apparently were documented in this case, such circumstances alone would not

support a finding of "facade" or "pass-through" corporation. I view the evidence in this case as barely sufficient on this point. In a similar case, with better capitalization, I believe such evidence would be insufficient.

There was no finding that there was a failure to observe corporate formalities, or that there was an absence of corporate records. Nonfunctioning of other officers in a closely held corporation is hardly significant. Therefore, the evidence in this case on the factual issues involved in disregarding the corporate form seems to me to be closely balanced.

But, merely because the evidence might also support other findings does not render the district court's findings clearly erroneous. *Walch v. Jacobson,* 361 N.W.2d 617, 619 (N.D.1985). There is evidence to support the findings made. Therefore, I concur.